**RECORD NO. 16-1254**

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

---

VIRGINIA ELECTRIC AND POWER COMPANY,
d/b/a Dominion Virginia Power,

*Plaintiff-Appellee,*

v.

BRANSEN ENERGY, INC.,
f/k/a Bransen Energy, LLC,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND

---

**OPENING BRIEF OF APPELLANT
BRANSEN ENERGY, INC.**

---

Sam P. Burchett
SAM P. BURCHETT ATTORNEY AT LAW
Suite 720
200 West Vine Street
Lexington, KY 40507
(859) 226-2100
spburchett@gmail.com

*Counsel for Defendant-Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. ___16-1254___    Caption: ___Virginia Electric and Power Co. v. Bransen Energy, Inc.___

Pursuant to FRAP 26.1 and Local Rule 26.1,

___Bransen Energy, Inc.___
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.     Does party/amicus have any parent corporations?                                      ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                                                                        ☐YES ☑NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature:  /s/ Sam P. Burchett                        Date:  March 23, 2016

Counsel for:  Bransen Energy, Inc.

## CERTIFICATE OF SERVICE
****************************

I certify that on ____March 23, 2016____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Sam P. Burchett                                    March 23, 2016
_____                                    _____
      (signature)                                           (date)

- 2 -

# **TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE

TABLE OF CONTENTS..................................................................i

TABLE OF CASES, CITATIONS, AUTHORITIES ...............................iv

STATEMENT OF SUBJECT MATTER AND
    APPELLATE JURISDICTION.......................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................2

STATEMENT OF THE CASE........................................................ 7

SUMMARY OF ARGUMENT ......................................................14

    A.    The Lost Coal Dispute. ...........................................14

    B.    Martial Breach Doctrine. .........................................14

    C.    Installment Contracts Under VA. § 8.2-612 ............................15

    D.    Demanding Impossible, Impracticable, and Illegal
        Performance Voids Agreements. ................................16

    E.    DVP Only Party To Materially Breach All Agreements. .........17

    F.    No Direct Damages ................................................17

ARGUMENT ..........................................................................18

    I.    STANDARD OF REVIEW ........................................18

    II.    JUDGMENT IN FAVOR OF DEFENDANT BRANSEN ON
        DVP'S CLAIM FOR MISSING COAL ............................18

    III.    BRANSEN DID NOT COMMIT A MATERIAL BREACH OF
        ANY AGREEMENTS WITH DVP ...................................19

A.    Quality Specifications Variances Not Breach of Contract Pursuant To Master Agreement Between the Parties ...............20

B.    Weight of Evidence, Governmental Approvals and DVP's Continued Usage Demonstrate Coke Breeze Was Acceptable.................................................................................23

C.    Delivery of Coke Breeze Not a Material Breach.....................24

D.    DVP's Use of the Coal Stockpile Inconsistent Material Breach .................................................................................27

E.    No Integration of Agreements. UCC does not apply to contracts For Services ...............................................................28

F.    DVP Rejected the Performance of a Service ...........................30

G.    No Damages Under Services Agreement .................................31

IV.    MASTER AGREEMENT AND PRE-COD CONFIRMATION ARE INSTALLMENT CONTRACTS UNDER VA. §8.2-612.........32

A.    Master Agreement and Pre-COD Confirmation Set Forth Exclusive Remedies .................................................................32

B.    Waiver of All These Exclusive Remedies ................................33

C.    No Direct Damages As Cover Resulted In Savings .................35

V.    DVP DEMAND LETTERS ARE BAD FAITH IMPOSSIBLE TO PERFORM AND SUCH DEMAND CONSTITUTES CONSPIRACY TO VIOLATE MSHA STATUTES .........................36

VI.    NO DAMAGES PROVEN UNDER THE COAL SERVICES AGREEMENT .................................................................................41

VII.    DVP FIRST TO MATERIALLY BREACH MASTER AGREEMENT, THE TWOPOST-COD CONFIRMATIONS AND THE COAL SERVICES AGREEMENT ...................................43

ii

VIII.  DAMAGES AWARDED AT DAMAGES HEARING NOT PROVIDED FOR IN AGREEMENTS .............................................46

A.    Lost Profits Not Permitted Under Contract ...............................47

1.    Lost profits/indirect damages............................................48

2.    Consequential damages......................................................49

3.    Incidental Damages/Lease increase costs.......................49

4.    Missing coal...................................................................50

5.    Coke Breeze ...................................................................50

6.    Balance of permit fees and cover savings. .....................51

CONCLUSION ............................................................................................51

STATEMENT REGARDING ORAL ARGUMENT ...........................................52

CERTIFICATE OF COMPLIANCE..................................................................53

CERTIFICATE OF SERVICE  ........................................................................54

# TABLE OF AUTHORITIES

## CASES

Page

*Bill's Coal Co. v. PUC of Springfield Missouri*,
887 F.2d 242 (10th Cir. 1989) ......................................................32

*Bituminous Coal Operators' Association v. Secretary of the Interior*,
547 F.2d 240 (4th Cir. 1977) ......................................................39

*Blue Stone Land Company, Inc., v. Neff*,
526 S.E. 2d 517 (Va. 2000) ......................................................49

*Everitt Plywood Corp v. United States*,
512 F.2d 1082 (Ct Cl. 1975)....................................................15, 25

*Filak v. George*,
267 Va. 612, 594 S.E.2d610 (2004) ........................................6, 31

*Hampton Roads Bankshares, Inc., et al v. Scott C. Harvard*,
781 S.E.2d 172 (Va. 2016) ....................................................17, 40

*Harriscom Svenska v. Harris Corp.*,
3 F.3d 576 (2d Cir. 1993) ......................................................40

*Housing Authority of Bristol v. East Tennessee Light & Power Co.*,
183 Va. 64, 31 S.E.2d 273 (1944) ................................................36

*Jacob & Youngs, Inc. v. Kent*,
129 N.E. 889 (N.Y. 1921)..........................................................24

*Richardson v. Secretary of Labor*,
689 F.2d 632 (6th Cir. 1982) ......................................................38

*Sahadi v. Continental Ill. National Bank & Trust Co.*,
706 F.2d 193 (7th. Cir. 1983) ....................................................27

*Sylvia Development Corporation v. Calvert County, Maryland*,
48 F.3d 810, (4th Cir. 1994) ......................................................18

*United States ex rel. Whitaker's, Inc. v. C.B.C. Enterprises, Inc.*,
   820 F. Supp. 242 (E.D. Va. 1993) ............................................................28, 34

## STATUTES AND CODES

28 U.S.C. § 1291(b) ...................................................................................1
28 U.S.C. § 1332 (c) ..................................................................................1
30 U.S.C. § 801 et seq ...............................................................................39
30 U.S.C. § 820(c) .....................................................................................38
30 U.S.C. § 820(d) .....................................................................................38

UCC § 2-604 ..............................................................................................24

Va. Code § 8.2-102 ....................................................................................28
Va. Code § 8.2-602 ....................................................................................36
Va. Code § 8.2-606 ...............................................................................28, 34
Va. Code § 8.2-606(b) ..........................................................................28, 34
Va. Code § 8.2-606(c) ...........................................................................28, 34
Va. Code § 8-2-608 ....................................................................................36
Va. Code § 8.2-612 ...............................................................................15, 19
Va. Code § 8.2-712 ....................................................................................35

## RULES

Fed. R. Civ. P. 56 (c) ................................................................................18

## OTHER AUTHORITIES

3A Arthur L. Corbin, Corbin on Contracts §946 (1960) ...........................25

General Overview of Remedies for Breach of Coal Supply Agreements and
Case Study; What Happens when the Trains Don't Show Up? McCallum &
Evans, 25 Energy & Mineral L. Inst. Ch. 8, p.232. (2005) .......................32

McCallum & Evans, 25 Energy & Mineral L. Inst. Ch. 8, p.231. (2005) ..............33

Restatement (Second) of Contracts § 261 (1981) ......................................37

Restatement (Second) of Contracts § 264 (1981) ......................................37
Restatement of Contracts § 457 (1932) .....................................................43

Restatement (Second) of Contracts, § 264 cmt.b.....................................................40

Restatement (Second) of Contracts § 341 (1979).....................................................25

William J. Geller, Note, The Problem of Withholding in Response to
    Breach: A Proposal to Minimize Risk in Continuing Contracts, 62
    Fordham L. Rev. 163 (1993) .........................................................................24

## STATEMENT OF SUBJECT MATTER AND
## APPELLATE JURISDICTION

The Appellee Virginia Electric and Power Company d/b/a Dominion Virginia Power ("DVP") originally filed a Complaint against the Appellant, Bransen Energy, Inc., (f/k/a Bransen Energy, LLC) ("Bransen") in the Eastern District of Virginia for breach of contract and without leave of court amended the initial pleading after answer was filed. (Joint Appendix 12 (hereafter "JA")("Amended Complaint"). The Amended Complaint alleged both diversity pursuant to 28 U.S. C §1332 (c) and demands in excess of $75,000 exclusive of interests and costs. The Appellant, Bransen Energy, Inc. responded by amended answer and amended counterclaim, JA 57, and admitted both diversity and demand in excess of $75,000.

This Court has appellate jurisdiction under 28 U.S.C.A. §1291(b) which grants the Circuit Courts of Appeal jurisdiction to review all final decisions of the district courts. The judgment appealed from is both a judgment of the district court granting partial summary judgment to the Defendants and denying Appellant's Motion for Partial Summary Judgment as well as the District Court's further final judgment on the issue of Appellee Virginia Electric and Power Company's damages. The order granting summary judgment was entered April 30, 2015. JA 2326, Memorandum Opinion and Order One. The Final Order granting Appellee's claim for damages was entered on February 11, 2016, JA 2823 Memorandum

Opinion and Order Two, as modified by Clerk's Judgment, JA 283. Appellant, Bransen Energy, Inc.'s Notice of Appeal was timely filed within thirty days on March 8, 2016. JA 2807, Notice of Appeal.

## STATEMENT OF ISSUES FOR REVIEW

1.     Whether Directed Verdict on Alleged Stolen Coal was Granted.

The Court granted judgment in favor of Appellant Bransen on Plaintiff/Appellee Virginia Electric and Power Company ("DVP") claims that Bransen had stolen (or misplaced) 41,094 tons of coal previously delivered and paid for by DVP. JA 2591 Trial Transcript, p. 167, lines 4-6. The Court then failed to incorporate Bransen's directed verdict/ judgment in either its Opinion or Order. More importantly, the lower Court did not deduct from the gross award of damages, the claimed damage amount for the alleged stolen coal of $1,830,613. JA 2591, Guy Davis cross-examination JA 2570, Guy Davis Report, at JA 4005. The failure to incorporate judgment for Bransen constitutes judicial error. Bransen seeks reversal on this issue with directions to enter judgment on behalf of Bransen, reducing the total damage claims by **$1,830,613**.

2.     Whether There Was No Material Breach of Installment Coal Supply Agreement.

The Court was in error in finding that Bransen was first to materially breach the Master Agreement, the Pre-COD Agreement and the Coal Services Agreement by supplying 43,000 tons of coke breeze as a base layer. It was DVP's initial

2

breach that resulted in the necessity of Bransen having to put down a base layer on DVP's leased property as DVP had failed to materially provide a proper coal stockpile tract.  JA 1835, Peters' Affidavit.

Under the doctrine of material breach, a seven (7%) percent deviation from the installment sales of over 600,000 tons of coal does not constitute, under applicable law and the contracts, a material breach.  Deviations in the installment deliveries of goods are dealt with specifically in both the Master Agreement, the Pre-COD confirmation and the Uniform Commercial Code on installment sales. The Court failed to apply these contractual provisions agreed to by the parties and guided by the UCC statutes and without legal justification therefore committing judicial error. Bransen did not materially breach the separate agreements and therefore is entitled to summary judgment as DVP has admitted it breached all the operative documents by refusing to further deal with Bransen at the latest by July of 2012 and that Bransen was not in breach of any of the agreements as of March 25, 2013, well past that time frame in which DVP breached by repudiating all the contracts.

> 3. Whether Notices of Defaults Requiring Bransen's Illegal Acts Under MSHA Was Impossibility of Performance and DVP's Bad Faith.

The Court erred in opining that DVP's notices of default under the operative agreements were valid, and were compliant with timing requirements when occurring some two and one-half years after the alleged defaults and more than a

year after any communications between the parties and the admission to then counsel for Bransen that in March of 2013 there were no termination nor current defaults by Bransen.

In addition, the Court makes light of the impossibility of performance under the demand letters and the involvement of MSHA in such demanded performance to comply with DVP's demands calling such a "kerfuffle." [1] The Demand Letters constituted a further breach of contracts by demanding impossible acts of Bransen illegal under applicable Federal Mine Health Safety Administration "MHSA") statutes and regulations the result of which would have been both civil and criminal penalties (including potential incarceration) not only for Bransen but DVP officials in conspiring to demand violations of MHSA statures and regulations. DVP, in demanding Bransen act illegally violated the provisions of each agreement that the party's actions in performing the obligations under the particular agreement comply with all laws, rules and regulations. Such impossibility of performance brought on by DVP's actions in hiring a substitute contractor renders both the demand letters and the underlying agreements void as to DVP. The lower Court ruling in this matter and as the first to breach would also be rendered null resulting in Bransen prevailing on all matters raised in its counterclaim and court filings because DVP was first to materially breach all agreements.

---

[1] "A fuss or commotion" but certainly not a demand to act illegally.

4.    Whether the Failure to Integrate Agreements and no Cross-default Provisions still Allowed Cross-defaults

The Court erred in referring back and forth between the sale of goods documents and the contractor/services agreement regarding contract modifications to the Uniform Commercial Code and doing so without opining that the operative agreements were or could be fully integrated.  Without integration, the Court's logic as to "rejection" rights as spelled out in the CSA fails completely as DVP was only rejecting a service performed and was not rejecting coal that had already been purchased and was owned by DVP.  In addition no operative contract contained a cross-default provision with other agreements as intimated by DVP and adopted by the lower Courts.

The CSA could not be integrated pursuant to its non-integration section agreed to by both parties.  Thus alleged defaults/damages under other agreements cannot be interpreted to be a default or damage under the CSA.  The District Court blurred those contract legal restrictions, ignored exclusive remedies in the agreements and alleged defaults under the one agreement with alleged damages (other than agreed to exclusive remedies) arising from another thus constituting reversible error.

5.    Whether Failure to Prove Damages Under Coal Services Agreement Negates DVP's Breach of Contract Claims and Extending Rejection to Goods Delivered and Accepted.

The Court ignored the only evidence regarding damages arising from the

CSA in that DVP's damage expert stated specifically in hearing testimony that there were no damages arising from the CSA. JA 2576-77, Trial Transcript. With no damages, the third element necessary to establish breach of contract as to the CSA was not proven and therefore there is no breach of contract under the CSA. *Filak v. George,* 267 Va. 612, 619, 594 SE.2d 610, 614 (2004).

Because the lower Court opinion hinges it's opinion on the finding that DVP properly rejected the 600,000 tons of coal delivered pursuant to the sale of goods agreements----by rejecting the service of putting together three 1500 ton ready piles of coal pursuant to the CSA, then if there is no breach of contract under the CSA, therefore there can be no breach of the sale of goods contracts as ruled by the lower Court.

In effect, the lower Court, without legal authority or applicable contract provision, concludes that the rejection of a service performed under the CSA (and again without any integration between sale of goods agreements and the services agreement) constitutes the rejection of the entire 600,000 tons of coal previously purchased and paid for by VEPCO, all completely incongruent to: the sale of goods contracts (installment sale agreements however modified); DVP personnel testimony that there was no rejection of the coke breeze or any or all installments of the coal delivered  and Virginia's version of the Uniform Commercial Code. The CSA does not provide for the remedies awarded for rejection of a total of 4500

tons of ready pile coal, the only remedy being a return to the stockpile, previously purchased and owned by DVP. The Court misconstrues this rejection as a rejection of all shipments under an installment contract with no allegations or proof by DVP that it revoked acceptance at any time, no proof that damages arose from the alleged breach of the Services Agreement and no proof that it followed contract language in actually rejecting shipments as opposed to ready piles.

6.    Whether DVP Proved Direct Damages.

DVP's damages expert, Guy Davis, indicated DVP's "direct" damages of in excess of $22,000,000. A careful analysis reveals that all of those damages were in fact indirect/lost profits, consequential, incidental and special damages all disclaimed or waived pursuant to the Master Agreement. Therefore there were no direct damages proven at the damages hearing and the lower Court's determination should be reversed.

## STATEMENT OF THE CASE

**A.    Factual Predicate**.

Bransen and DVP entered into a Master Coal Purchase and Sale Agreement dated November 8, 2010. ("Master Agreement"). JA 125 at 125. In addition, a Pre-COD Confirmation was also entered into on January 26, 2011 wherein Bransen was to deliver 450,000 tons of Run of Mine Coal, as defined in the Confirmation, with DVP's option to purchase an additional 150,000 tons, all by

7

December 31, 2011. ("Pre-COD Confirmation") JA 461. The Pre-COD Confirmation expired of its own term on December 31, 2012 without any rejection or notice of default.  To store the delivered material DVP entered into a Lease Agreement with Coal Technology International, LLC ("CTI") for a site CIT owned near Lambert, Virginia. (the "CTI Site") and this was where the Coal Stockpile was to be located ("Coal Stockpile") JA 474. (later amended several times). DVP and Bransen also entered into a Coal Services Agreement, wherein Bransen (through a subcontractor agreement with CTI ) was to provide certain services at the CTI site. JA 826 "CSA" .[2] During 2011, Bransen delivered, in installments, over the period of the year to the Coal Stockpile, in excess of 599,923.34 tons of coal pursuant to the Pre-COD Confirmation meeting on an aggregate basis the quality specifications set forth in the Agreements (actual deliveries totaled 601, 359.54).  Bransen Quality Analysis Exhibit 9 to damages hearing; Sutherland testimony at damages hearing.  JA 2687-90; JA 490,  Sutherland dep. DVP, upon delivery by Bransen to the Coal Stockpile, took title and ownership of the delivered goods pursuant to the Master Agreement. JA 629-635 . At no time during

---

[2]    CTI became the MSHA mine operator on December 1, 2010.  Judicial notice of Federal Government website: arlweb.msha.gov; then access MSHA Mine ID: 4403443; then access operator history and Mine employment and coal production totals for years 2013-2016

any installment deliveries did DVP conduct its own analysis.[3]  DVP never rejected any shipment of or the entire Coal Stockpile from January of 2011 through June 15, 2014, nor revoked acceptance during that three-year period of 2011-2014.  JA 286, 293-4 Roarty dep. CTI, pursuant to its subcontracting agreement with Bransen, had Bransen deliver a coal product called "coke breeze" of approximately 43,000 tons which was then laid down by CTI as a base under approximately 60% of the Coal Stockpile.   The coke breeze substantially met requisite quality specifications as set forth in the Pre-COD Confirmation. JA 462. [4]

DVP and Bransen, as completion of the Pre-COD Confirmation neared, entered into two new separate Post-COD Confirmation for the purchase by DVP and sale by Bransen of an additional three (3) million tons of waste coal with each confirmation having different quality specifications and price. JA 996 Post-COD Confirmations; JA 199-202 Carney Dep.   Each of those Post-COD Confirmations expressly stated that DVP "**shall** submit a weekly order to Seller." (Emphasis added) JA 998, 1011.

In December 2011, DVP Board of Directors and others received a  "tipster" letter alleging that millions of dollars of kickbacks were going on between Bransen

---

[3]      DVP certainly had the right to test each shipment.  See Master Agreement, JA 138, Section 4.4. on Sampling and Analysis. However, DVP never sampled even one truck delivery to the Coal Stockpile completely inconsistent with coal end user course of performance.

[4]      The coke breeze constituted seven (7%) percent of the delivered tonnages.

and DVP personnel at the CTI site and that it was the "biggest scam I have ever seen in all my years in Eastern Kentucky and Southwest Virginia." JA 1850/sealed at JA 5455, Tipster Letter. As a result of this "tipster letter" DVP launched an "investigation" that resulted in (i) no evidence of the "biggest scam" or millions of dollars in kickbacks[5] and (ii) DVP deciding to cease business with Bransen thus repudiating both Post-COD Confirmations for future delivery of three million tons of coal to VCHEC. [6]

During and subsequent to the DVP investigation, DVP asked CTI (Bransen's subcontractor") to prepare three ready piles of approximately[7] 1500 tons each for delivery to VCHEC. All three were "rejected" by DVP and not deliverd to VCHEC. To demonstrate that coke type material can exist in run of mine coal Peters requested that DVP meet at the Red Fox mine and sample run of mine coal. JA 1833 Peters Affidavit. That sampling was conducted independently through SGS. This SGS analysis demonstrated that run of mine coal from the Red Fox mine contained at leaset 0.60 percent of coal material being defined by SGS as coke breeze even though it was produced run-of-mine and not by coking methods.

---

[5]     JA 1217-1218 Workman dep.

[6]     JA 1176, Workman dep. As 2012 began the continuing free-fall in coal prices, this decision was certainly gratuitously rewarding to DVP in that it saved tens of millions of dollars in fuel costs for the VCHEC by defaulting on Bransen's Post-COD Confirmations. *See www.eia.gov/todayin energy/detail.cfm?id=9570#;* January 14, 2013: 2012 Brief; Coal prices and production down in 2012.

This analysis was conducted on April 24, 2014. JA 2088; JA 5348; SGS dep. Thus, DVP's own analysis demonstrates that coal material defined as coke breeze occurs naturally in some run of mine coal which run of mine coal from Red Fox conprised a significant portion of the run of mine coal delivered to the Coal Stockpile and serves to explain that coke breeze was not blended but came generally from the Red Fox mine.[8]   Again, at no point during 2012 did DVP reject as that term is defined in the Master Agreement or the Pre-COD Confirmation, any installments of coal.[10]  At no time did DVP reject the entire Coal Stockpile. JA  86, Roarty dep; JA 86, Workman dep.

At some point in early 2012, and during the attempts by Bransen to perform under the Coal Services Agreement, a DVP decision at the executive level was made that DVP would do no further business with Bransen and Mike Peters, as well as BKF Equipment and Brian Fendley.  "It was expressed pretty simply, 'We're not doing any more business with Bransen, period.  It wasn't let's talk about it, let's have a discussion, let's go through—just that's it. Statement, end of story'" JA 334, Roary dep. Mr. Workman testified "we would not be doing further business with Bransen." JA 1176. Workman dep.  During 2012 and 2013 Bransen

---

[8]     Approximately 300,000 tons from Red Fox and at a calculation of .06 per ton of naturally occurring coke breeze would be .06 x 303,151=18,189 tons of naturally occurring coke breeze present in the Coal Stockpile and not attributable to Bransen's delivery of a coke breeze base.  JA 2115, Rigsby Affidavit; JA 4991 Bransen incoming analysis.

[10]    JA 285-286, Roarty dep. " I can't recall it, no, suspension or rejection."

continued to secure coal reserves for purposes of performing under both Post-COD confirmations and the CSA Bransen made a number of good faith attempts to resolve matters with DVP steadfastly refusing any viable resolution absent the payment of millions of dollars to DVP and instead proceeded to replace CTI as the permittee and operator on the CTI site as of June 1, 2013.  JA 1854, Omega Agreement[11] (most of agreement redacted at request of DVP despite it being a public record in the lower Court). Subsequently, DVP has removed (as of the filing of this brief) more than 356,363 tons of coal from the Coal Stockpile[12] as demonstrated by MSHA Operator History for Mine ID 4403443.  The operator since June 1, 2013 is Harold Keene Surface Co., LLC, and the controller since June 1, 2013 is Omega Holdings, LLC 37.

DVP issued to Bransen a cease and desist letter on June 22, 2013 refusing Bransen entry to the Lambert site or Coal Stockpile to which Bransen counsel responded on June 25, 2013 JA 1666.  Bransen could not reenter the CTI site/Coal Stockpile to commence performance under the CSA of 2013 because DVP never lifted the cease and desist letter..  There was no communication between DVP and

---

[11]    Page 5 of the Omega Agreement makes clear that DVP's position vis a vis the 600,000 ton Coal Stockpile had not been rejected but rather "DVP owns 600,000 tons of coal and waste coal product, the 'product' " JA 1854.  DVP holds and shall continue to hold sole and exclusive right, title and interest in and to the Product at the Premises" JA 1856.

[12]    That comprises almost sixty percent of Coal Stockpile. $356,363/599923 = 0.594\%$.

Bransen between the issuance of that letter in June of 2013 and when Bransen on June 12, 2014 formally declared a breach and demanded performance.[13] At no time before June 23, 2014, did DVP declare a default under the Master Coal Purchase and Supply Agreement, the Pre-COD Confirmation, the two Post-COD Confirmations or the Services Agreement; instead that each was still in force. In a letter dated June 15, 2014, Bransen, after about a year of Bransen where DVP had no contact to reconcile with Bransen made demand that DVP perform. DVP responded with a number of Default Letters, then the initiation of this action and amended action, after a thirty-day letter regarding the failure to perform under the Coal Services Agreement. *See* JA 12, Amended Complaint. As set forth in paragraph 53 of the Amended Complaint, DVP alleges it sought performance by Bransen within thirty (30) days following notice of default. As of June 30, 2014, neither Bransen nor CTI were operators or controllers on the CTI site, with DVP having entered into a services agreement with Omega Holdings on June 24, 2013. [14] Again, Omega is listed as the controller. JA 1854, Omega Services Agreement.[15]

---

[13]    The lower Court simply adopted DVP disputed fact that communications were continuous for two years. That simply was not the case. DVP made no efforts at further resolution for more than a year. To the extent this was a factual dispute going to the essence of whether good faith attempts at resolving disputes, the summary judgment should not have been granted.

[14]    See Steele Declaration, JA 2232; JA 1854, Omega Agreement.

[15]    A comparison of JA 1854, redacted, the Omega Agreement and the CSA demonstrates that Omega was performing the exact same services DVP contracted

Thus, DVP having replaced CTI as the Controller, it was impossible legally and impracicable physically for  Bransen, or its subcontractor, CTI to reenter the CTI site and Coal Stockpile and replace Omega to commence performance under the Bransen Services Agreement.  There was no demonstration by DVP that it had ceased its agreement with Omega.

B.    Relief Sought.

Appellant Bransen seeks reversal on all issues in favor of DVP both from the grant summary judgment and the findings of damages in the amount of $22 million.

## SUMMARY OF ARGUMENT

A.    **The Lost Coal Dispute.**

Having abandoned the claims for 41,000 tons of lost or stolen coal, DVP failed to actualize that abandoned claim by filing a proper notice of dismissal.  To rectify that matter Bransen moved at the damages hearing for a directed verdict on the $1,803,613 damage claims arising from the alleged stolen coal, which was granted by the lower Court but not included in its opinion.

B.    **Martial Breach Doctrine.**

The lower Court erred by finding that Bransen had committed a material breach of contract, and a first to breach, by delivering 43,000 tons of coke breeze

---

Bransen to perform and demonstrates the impracticability of demanding Bransen return and perform the same services Omega was performing.

to the Coal Stockpile to serve as a base layer.  In ruling for DVP the lower Court failed to consider the rejection and suspension provisions of the operative Master Agreement and Pre-COD Confirmation regarding variance from quality specifications and that such variances were specifically excepted from the breach of contract provisions set forth therein. The delivery of coke breeze constituting less that seven percent of volume of goods delivered, pursuant to *Everitt Plywood Corp v. United States,* 512 F.2d 1082 (Ct Cl. 1975) should not be considered a material breach.  The Court did not also consider the opposite being substantial performance.

The probative evidence was that DVP failed to follow its sale of goods agreements regarding rejection and therefore waived the claim for damages it was awarded. Instead the lower Court focused on the services agreement integrating same to the sale of goods agreements ignoring the non-integrations clauses of each. As DVP's expert opined, there was no damages under the services agreement and therefore no breach of contract.

### C.      Installment Contracts Under VA. § 8.2-612.

Both lower Court opinions ignore and fail to apply installment contract application under VA §8.2-612 and instead asserts "perfect tender" for all the coal delivered through multiple and daily installments.  Compounding this error, both lower Court opinions fail to apply the parties agreed to terms for exclusive

remedies for the installment deliveries of non-conforming goods pursuant to Section 5 of the Master Agreement. Because the testimony evidence from DVP is that DVP did not reject any installment or the whole Coal Stockpile, even after discovery of the non-conforming goods, the lower Court should have applied the waiver provisions under Section 5 of the Master Agreement. Instead the lower Court invoked the perfect tender rule awarding in excess of $22,000,000 in non-direct damages despite the only direct "cover" damages were a savings of almost $400,000 to DVP.

**D.    Demanding Impossible, Impracticable, and Illegal Performance Voids Agreements.**

In June of 2013, upon demand by Bransen that DVP perform under the two Post-COD Confirmation, DVP demanded that Bransen return to the Coal Stockpile and remove the 600,000 tons of coal within three days and commence performance under its Coal Services Agreements despite Omega Holdings, having been contracted to do so from June of 2013. DVP had already used more than seventy thousand tons of coal it was demanding Bransen retrieve. It was physically impossible to remove the remaining 530,000 tons in three days and DVP did not lift its cease and desist letter forbidding Bransen from entering the Coal Stockpile. Most importantly, Bransen was not the authorized controller/operator under MSHA statutes, that being Omega Holding/Harold Keene all at the direction of DVP.

16

For Bransen to have reentered the Coal Stockpile without out the several month process of replacing Omega as controller and Harold Keene as operator would constitute illegal activity in violation of MSHA safety standards subjecting both Bransen and DVP and associated officers to civil and criminal penalties including incarceration thus rendering the demands and associated contracts void. *Hampton Roads Bankshares, Inc., et al v. Scott C. Harvard,* 781 S.E, 2d 172, 179.

### E.    DVP Only Party To Materially Breach All Agreements.

The lower Court erred in refusing to consider that DVP was the only party to materially breach all the agreements by declaring in early 2012 that it would do no further business with Bransen despite its ongoing obligations under the Coal Services Agreement and the two Post-COD Confirmations for future coal deliveries in excess of $90 million.  It is Bransen, not DVP, who is entitled to damages for those first to materially breach each agreement.

### F.    No Direct Damages.

The lower Court erred in granting damages to DVP exceeding $22 million as none of those damages were provided by or allowed pursuant to the limitations of damages found in the Master Agreement and Services Agreement.  The only direct "cover' damages were in fact savings of $400,000.

## ARGUMENT

### I.     STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo. See *Sylvia Development Corporation v. Calvert County, Maryland*, 48 F.3d 810, (6th 817 (4th Cir. 1994). Summary judgment is only proper where the Court "must draw any permissible inference form the underlying facts in light most favorable to the party opposing the motion." Id.  To grant summary "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c).  That clearly was not the case here.

### II.     JUDGMENT IN FAVOR OF DEFENDANT BRANSEN ON DVP'S CLAIM FOR MISSING COAL.

Based upon a clear demonstration that there was no missing coal arising from DVP's reliance on faulty techniques for measuring the coal stockpile resulting in DVP's statements to Court that it had "abandoned the claim for missing coal" (without actually filing a pleading dismissing that claim) JA 2591, Trial Transcript, lines 18-21. Bransen moved for judgment in its favor on this claim that was then granted by the Court. JA 2591, Trial Transcript, lines 4-6). Pursuant to DVP's expert, Guy Davis report of $1,830,613 in claimed damages for missing coal, Bransen is entitled to judgment that DVP has not been damaged in

the amount of $1,803,613 which shall serve as a reduction from DVP's alleged damages as set forth in the Davis' report and testified to at the damages hearing. JA 2398, Trial Trail Transcript.

## III.   BRANSEN DID NOT COMMIT A MATERIAL BREACH OF ANY AGREEMENTS WITH DVP

The lower Court opines that the delivery of 43,000 tons of coke breeze was "not Run-of-Mine Coal and therefore could not have met the specification in the Pre-COD Confirmation" was improperly delivered and "place[d] Bransen in breach of contract." JA 2299, Opinion One. The lower Court disallows not only Mike Peter's sworn affidavit as false and indicates that his affidavit was the only evidence that the coke breeze met specifications. Explicit in the lower Court's ruling is that not meeting specifications as to any Shipment (as defined in the various agreements) in an installment sales agreement results in a material breach of contract of the entire sale of goods agreement.[16] There are a number of primary

---

[16]    The lower Court, in the hearing on damages, persisted with the theory of "perfect tender" throughout the hearing while apparently ignoring that "perfect tender" is inapplicable to a long-term installment sales agreement under Va. Code §8-2-612. Were that the case, virtually every shipment of coal to an end user would be a material default under every coal sales agreement resulting in chaos. Because coal is not a static good and its quality can vary significantly from one load to the next, over time the coal industry development generally coal sales contracts that dealt with such variations of quality from specifications required by the end user by dictating through contract, (1) sets of price adjustments, either up or down and of the specific quality specifications the end used deems appropriate. Here, DVP, in Exhibit E-1 provided that should Btu delivered on a weekly quality basis be higher or lower than the guarantee, price is adjusted by the formulae: Btu  $/ton

issues the lower Court failed to include in its analysis and opinion that were necessary to reach its conclusion and those glaring failures renders the lower Court's core rulings unsupportable from fact and law and should be reversed.

    A.    Quality Specifications Variances Not Breach of Contract Pursuant To Master Agreement Between the Parties.

Having opined that the variance from agreed to quality specifications was the material breach of contract, nowhere does the lower Court discuss nor actually apply the agreed to contract language actually dealing with the Seller's variations from the quality specifications as set forth in the Master Agreement and Pre-COD Confirmation. If the lower Court had analyzed the parties agreed to language, the result is that Bransen could not have materially breach the contracts for the following reasons: (i) The Master Agreement, in Article 5, provides for Buyer to elect among only two outcomes should any of Seller's installments vary the Specifications by either:

---

adjustment+[(as received Btu-Guaranteed Btu)/Guaranteed Btu * Price. JA 125 at 189, Master Agreement, Exhibit E-1 and (2) rejection limits over or under which the Buyer may reject a particular coal load or shipment. Here guarantee limit was 7,700 Btu and the rejection upper limit for the coal product was 8,200 Btu. JA 461, Pre-COD Confirmation. *See generally,* See Park, Sweeney VanKirk and Americus; Coal Supply Contracts, §84.02; Coal Law and Regulation, Matthew Bender (1984) for discussion of limitations on recovery under terminated coal supply agreement. (Abbreviated copy attached).

Section 5.2

(i) rejecting such Non-Conforming Shipment at the Delivery Point….or
(2) reaching a mutually acceptable price adjustment or other arrangement with Seller.

If Buyer fails to timely exercise its rejection rights under this Section 5.2 as to a Shipment, Buyer shall be deemed to have waived such rights under this Section 5.2 as to a Shipment only and the provisions of Section 5.1 shall apply. [17]
JA 125, Master Agreement at page 12.

(ii) In addition, the Master Agreement under Section 8.1 on Events of Default, the Master Agreement specifically **excepts** out of Events of Default **"Seller's obligations to deliver Coal pursuant to the Specifications contained in a Confirmation, the exclusive remedy for which is provided in Sections 5.1, 5.2 and 5.3. JA 125, Master Agreement at page 17. (Emphasis added).** Delivery of non-conforming goods, under the Master Agreement, is *not an Event of Default* and therefore may under no circumstances be considered a breach ("materially" or otherwise) of contract. To rule otherwise, as the lower Court did, is to say the parties' agreements, specifically on topic, are inapplicable. For the lower Court to dispense with the parties' agreed to exclusive provisions on variances of quality and what constitutes a breach of contract the lower Court would have to opine as to

---

[17] "If the Coal delivered under a Transaction varies from the Specifications (here, Btu) in the Confirmations for such Transaction and Buyer does not exercise its rejection rights under Section 5.2, quality adjustments shall be calculated pursuant to the formulas set forth in Exhibit E… JA 189, Master Agreement

why those provisions should be discarded. The opinion does not provide such basis and thus its rulings should be reversed.

There was no DVP allegation of ambiguity (DVP drafted all documents) set forth in the Amended Complaint or argued in its Motion for Summary Judgment as well as no insertion of parol evidence to vary the stated terms. The lower Court just skips all these very specific parameters set forth in the agreements apparently because DVP waived all of those specific remedies for quality variations with all DVP personnel involved admitting there was no rejection, no modification of price and no quality adjustments made regarding Bransen's variances on coal quality. JA 285-288, 293, Roarty depo. p. 60-63, 68. The coke breeze was never rejected either as delivered or anytime thereafter. JA 314, Id. p. 89. DVP therefore, pursuant to Section 5.2 of the Master Agreement waived any right to later claim a material breach of the Pre-COD Confirmation or the Master Agreement and seek damages, direct or otherwise.[18]

---

[18]     DVP recognizing its failure to comply with rejection terms in Section 5 of the Master Agreement by arguing that Bransen breached material representation prior to execution which then continued and that constituted the methodology around the specific remedies in Section 5. Apparently the lower Court did not pick up on this nuanced argument circumventing the Parties agreements on exclusive remedies regarding variations or non-conforming goods contractually not a breach of contract. See DVP's Memorandum in Support. JA 107.

B.    Weight of Evidence, Governmental Approvals and DVP's Continued
       Usage Demonstrate Coke Breeze Was Acceptable.

The lower Court indicates the only evidence that coke breeze met the generally the quality specifications was Mike Peter's affidavit. The lower Court ignores the following persuasive evidence that coke breeze generally met the Pre-COD Confirmation for Coal Specifications. Most importantly, in the deposition of Ed Roarty, the DVP officer in charge of these applicable contracts[19] Roarty agreed that the quality specifications of the coke breeze delivered to VEPCO met the coal specifications as to sulfur, moisture and except the BTU being above the reject specification of 8,200. JA 312-313 Roarty dep. In addition, the applications for amendments to the air quality permits, made by DVP's Robert Bisha to the Virginia Department of Environmental Quality, to allow the use of coke breeze ("coke derived solid fuel") serves as an admission that the coke breeze met the requirements for use at the VCHEC and Lee Rigsby, Bransen's expert witnesses was in agreement on this point. See Bisha declaration with exhibits, JA 1728. Thus, in evaluating undisputed facts to support a summary judgment, the lower Court merely adopted DVP's statement of facts and apparently missed probative evidence demonstrating that there was factual dispute regarding coke breeze as a performance fuel for the VCHEC. The refusal to consider probative evidence

---

[19]    At retirement, Mr. Roarty was Director of Fuels, Commercial JA 230, Roarty depo. p. 5

(including DVP's own admissions and DVP's governmental permit applications) is in error under any applicable summary judgment standard.

### C.    Delivery of Coke Breeze Not a Material Breach.

Inherent in the "first to breach" doctrine is that such breach must be material as to the whole contract and not just one or a few installments.[20]  In *Jacob & Youngs, Inc. v. Kent,* 129 N.E. 889 (N.Y. 1921) Judge Cardozo set forth the parameters for a determination of whether the first breach was of such magnitude as to excuse further performance by the non-breaching party.  Most notably, "there will be no assumption of a purpose to visit venial faults with oppressive retribution." Id. p. 891. Cardozo outlined three factors:  (i) degree of harm to the defaulting party suffering inequitable forfeiture;[21] (ii) degree of harm as to the expectations of the non-breaching party[22] and (iii) good faith.[23]  The *Restatement (Second) of Contracts,* Section 241 the Second Restatement expands on Cardozo

---

[20]    Mike Peters points out that DVP was the first to breach in his interview summary noting that DVP had failed to provide an adequate storage site necessitating the use of the coke breeze as a base layer.  Thus, it was DVP who first materially breached the Agreements under the lower Court's expansive view of minor breaches being a material breach as to all contracts.  Some commentators have noted the "first to breach doctrine" is analogous to the parent punishing only the child who started the fight and noting that determination is not relevant as both children contributed to and escalated the fight. *See* William J. Geller, Note, *The Problem of Withholding in Response to Breach: A Proposal to Minimize Risk in Continuing Contracts,* 62 FORDHAM L. REV. 163, 190 (1993).

[21]    Bransen expectation that it would supply $80 to $90 million dollars worth of coal to DVP through 2016.

[22]    DVP's cover savings of almost $400,000 less permit costs of $14,000.

[23]    DVP's bad faith in demanding Bransen act illegally or be terminated.

with five factors.[24] 3A    With regard to an evaluation of a complete breach compared to a partial breach, Corbin states " a partial breach by one party …does not justify the other party's subsequent failure to perform; both parties may be guilty of breaches, each having a right to damages."  3A Arthur L. Corbin, *Corbin on Contracts* §946, at 949 (1960).

A review of case law dealing with a percentage of breach issue (here less than 7%) is illustrative of the demarcation between a material breach and one deemed not material.  In *Everitt Plywood Corp v. United States,* 512 F.2d 1082 (Ct Cl. 1975), the Forest Service, in a timber contract (note similarity to another natural resource contract) denied access to the lumber contractor for about six and one/half percent (6.5%) of the contracted for lumber.  The Court determined that at such a low percentage of the lumber involved, "neither defeated the whole purpose of the contract nor deprived plaintiff of substantially all it had bargained for. Id. Specifically, the Forest Service was not in material breach of the timber agreement

---

[24]    (a) the extant to which the injured party will be deprived of the benefit which he reasonably expected:

(b) the extent to which the injured party can be adequately compensated for the part of that benefit to which he will be deprived:

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the parties failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Restatement (Second) of Contracts §341 (1979).*

25

even though the timber contractor could not access less than ten percent of the contracted for timber acreage. Therefore, on facts exactly analogous, the shipments to DVP of 43,000 tons of coke breeze out of a total shipment of 600,000 tons should be the deciding factor in the court's determination that these (ignoring the contract provisions that variance from quality specifications was not an event of default, i.e. a breach of contract) small amount of tonnages with quality specifications variances (specifically the somewhat higher Btu) was not a material breach of contract.[25]

The alternative theory of substantial performance indicates that if a party substantially performs i.e. delivering the 600,000 tons of coal to DVP at the Coal Stockpile and within the time frame demanded by DVP under the Pre-COD Confirmation, then Bransen should not be considered to have committed a material breach regarding small installments totaling 43,000 tons not meeting all specifications because Bransen had substantially performed its Pre-COD Confirmation timely. *Corbin §§700-712*.

In considering complex factual determinations involved in a court's decision of whether material breach or substantial performance, courts have been reluctant

---

[25]    Alternatively, and as testified to by Bransen's expert witness, Lee Rigsby, in affidavit form, the coke breeze was of such limited quantities it fell properly within the ambit of the "limited" amounts of extraneous material provided for under the definition of "run-of-mine" coal set forth in the Pre-COD Confirmation thus supporting both the non-material breach and substantial performance doctrines under applicable contract law. JA 2115, Rigsby Affidavit.

to rule on summary judgment indicating that such factual determination belies the grant of summary judgment. *Sahadi v. Continental Ill. Nat'l Bank & Trust Co.* 706 F.2d 193, 200 (7th. Cir. 1983).

      D.     DVP's Use of the Coal Stockpile Inconsistent with Material Breach.

Taken at face value, the lower Court's opinions are that Bransen's ruination of the 600,000 tons of coal delivered to the Coal Stockpile located at the Lambert lease site was of such magnitude that it was a material breach of all the contracts entitling it to in excess of $22 million dollars in damages is that the proof is in the taste of the pudding. To date (as of the end of April, 2016) according to MSHA records for the Lambert coal stockpile site, DVP has utilized about sixty (60%) of the 600,000 tons delivered by Bransen to the Coal Stockpile. Most interestingly, following the damages hearing in July of 2015, DVP has ramped up production and has removed and utilized **219,889** tons from the Coal Stockpile (last two quarters of 2015 and first quarter of 2016).[26] So once the trial was over DVP rapidly increased deliveries to the VCHEC for the coal it testified at trial was unusable. On this point DVP was disingenuous at best. Bluntly, DVP seeks to use the coal if never rejected but to which the lower Court believe it did, have Bransen reimburse for virtually all it was paid and reimburse for exorbitant attorneys fees

---

[26]    Judicial notice of Federal Government website: arlweb.msha.gov; then access MSHA Mine ID: 4403443; then access Mine employment and coal production totals for years 2013-2016,

and refuse to do further business defaulting on more than $90 million in coal it had contracted with Bransen to purchase.  Virginia's UCC provision providing that a buyer's actions regarding the rejected goods inconsistent with the seller's ownership constitutes acceptance and therefore belies any buyer's claim for rejection damages. § 8.2-606(b) and (c).  DVP took title, paid for the Coal delivered and exercised its ownership by utilizing at this point sixty  (60%) percent of the Coal to use in its operations. This is complete acceptance under the UCC[27] and utilizing the coal in its operations, under UCC 8.2-606(b) and (c).  Without rejection, there is no breach material or otherwise of the Master Agreement or the Pre-COD Confirmation.

E.    No Integration of Agreements. UCC does not Apply to Contracts for Services.

DVP argued that all the agreements were to be read in tandem in its briefs and the lower Court agreed indicating in its opinion that the rejection of three ready piles under the Coal Services Agreement constituted a rejection of the entire stockpile. However, the evidence and the agreements are diametrically opposed. First, the Uniform Commercial Code Va. Code § 8.2-102 states "this article applies

---

[27]    *United States ex rel. Whitaker's, Inc. v. C.B.C. Enterprises, Inc.*, 820 F. Supp. 242 (E.D. Va. 1993) ("By taking possession of the cabinets, cutting them to fit over pipes and installing the units, [defendant] accepted the cabinets within the meaning of the UCC.").  *Accord* Va. Code §8.2-606 Official Comment 4 ("Under paragraph (c), any action taken by the buyer, which is inconsistent with his claim that he has rejected the goods, constitutes an acceptance.").

to transaction in goods." Not services! Yet, with legal abandon, the lower Court opines that in the performance of a service under the Coal Services Agreement, DVP (but certainly not Bransen) intended that to be the operative rejection rights and ignoring or dispensing with the agreed to rejection rights under the Master Agreement at Section 5 and the rejection rights under the Pre-COD Confirmation and with no legal finding that these agreements were integrated rules that DVP properly rejected the entire 600,000 tons. If DVP (again, having drafted all these documents) had actually intended for those documents to be integrated it would have provided integration language within each. It specifically did not. The Master Agreement references the confirmations as integrated (indicating it knew how to integrate) but does not mention whatsoever the CSA and likewise the CSA does not integrate with the Master Agreement, stating specifically "this Agreement constitutes the entire agreement between the Parties related to the subject matter hereof and supersedes prior or contemporaneous agreement or understanding between the parties." JA 826, 842, Coal Services Agreement. More problematic for both the Court's ruling and DVP's underlying arguments that all agreements are to be read together, is the very specific testimony of Ed Roarty, the DVP official that executed virtually all DVP documents on behalf of DVP. He stated, when asked about the integration of the confirmation and services agreement: "They are two separate agreements. They are two separate agreements with their

own standalone rights and obligations."   JA 290, Roarty depo. p. 65.   Again, Roarty testified that no rejection rights were exercised under either the Master Agreement or the Pre-COD Confirmation.   JA 293, Id. p. 68.   The lower Court erred when finding that the rejection rights under the Services Agreement were to be applied back as substitution for the rejection rights under the Pre-COD Confirmation and the Master Agreement.   The agreements by their non-integration language could not be integrated and the person executing those agreements on behalf of DVP acknowledged that they were separate and non-integrated.   Both Roarty and Workman testified that there was no rejection of goods under the Pre-COD Confirmation and therefore there can be no damages, direct or otherwise arising from the Pre-COD Confirmation.

F.     DVP Rejected the Performance of a Service.

It is called a Coal Services Agreement for a purpose.   The CSA was not a sale of goods transaction.   DVP owned the coal that had not been rejected under the Master Agreement and the Pre-COD Confirmation. [28] Rather the rejection of the service of compiling a ready-pile and shipping to VCHEC wherein DVP had the right to reject that compilation and shipping.   Again, a service.   DVP had no right to reject a ready-pile prior to shipment.   That language does not appear

---

[28]     In reviewing agreements with other contractors DVP admits its ownership of the 600,000 tons of coal.   *See* Omega Services Agreement JA 1854 (Most of Agreement redacted at DVP's request for confidentiality reasons; but see lower court docket.

anywhere within the confines of the Coal Services Agreement. DVP just made this up.  DVP was the first to breach by rejecting ready piles prior to shipment without the contractual right to do so. Despite the lower Court finding that the rejection of three ready-piles prior to shipment, each constituting about 1500 tons, was a rejection of the entire 600,000 tons delivered and paid for (really a revocation), neither the 4500 tons nor the 600,000 tons were ever returned to Seller.  That was because they were still owned by DVP both before and after the "rejection."  These sort of legal machinations without basis in law or fact and purportedly supporting a grant of summary judgment raises serious issues of competency.  Regardless, the only remedy for a rejection of a shipped ready pile was a return to the Coal Stockpile at the Bransen's expense.

      G.     No Damages Under Services Agreement.

      Despite the allegations that Bransen defaulted under the Coal Services Agreement, DVP, through its expert, Guy Davis, could point to no damages arising from the Bransen's alleged defaults under the Coal Services Agreement.  Because damages are an integral element of breach of contract, without damages there can be no breach of contract.  *Filak v. George,* 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004). Putting aside the other arguments, the lower Court's ruling that the breach of the coal services agreement in DVP's rejection of three ready-piles drove the finding that Bransen had breached the other agreements fails if there were no

damages arising from that alleged breach and therefore no breach of contract.

## IV.    MASTER AGREEMENT AND PRE-COD CONFIRMATION ARE INSTALLMENT CONTRACTS UNDER VA. §8.2-612

Despite DVP's arguments otherwise, the Master Agreement and Pre-COD Confirmation constitute installment contracts under VA. §8.2-612, as contracts requiring or authorizing delivery of goods in separate lots to be separately accepted.[29]    Special rules apply including specifically that the perfect tender rules do not apply (as the lower Court applied during trial and in ruling for DVP on damages.  See JA 2398, Trial Transcript at p. 80 -81) despite DVP's allegations in its First Amended Complaint and at trial.  When there are quality issues with regard to a particular shipment or installment, that does not justify "an immediate lawsuit for breach of the whole contract."[30]

### A.    Master Agreement  and Pre-COD Confirmation Set Forth Exclusive Remedies

As previously referenced, the only legal remedies available to both a Buyer and Seller under a coal supply agreement are those specified contractual

---

[29]    General Overview of Remedies for Breach of Coal Supply Agreements and Case Study; What Happens when the Trains Don't Show Up? McCallum & Evans, 25 Energy & Mineral L. Inst. Ch. 8, p.232. (2005)

[30]    Id., McCallum & Evans, 25 Energy & Mineral L. Inst. Ch8, p. 231 citing to *Bill's Coal Co. v. PUC of Springfield Missouri,* 887 F.2d 242 (10th Cir. 1989) *holding modified on other grounds.*

[30]    Id., McCallum & Evans, 25 Energy & Mineral L. Inst. Ch8, p. 231 citing to *Bill's Coal Co. v. PUC of Springfield Missouri,* 887 F.2d 242 (10th Cir. 1989) *holding modified on other grounds.*

remedies. [31] Section 5.1, 5.2 and 5.3 of the Master Agreement and Pre-COD Confirmation set forth DVP's **exclusive remedies** for delivery of coal pursuant to the Specifications as provided in Section 8.1(ii) of the Master Agreement. Read together, those sections take the variances from stated quality Specifications out of the Events of Default provisions of Section 8.1, consistent with the Agreements being installment contracts (see above), and relegate such variances to exclusive remedies found in Section 5-Quality Adjustments Rejection and Suspension Rights, and in particular, Buyer's Section 5.2 rejection rights.

B.    Waiver of All These Exclusive Remedies

DVP's admissions that it did not timely reject any Shipments, the coke breeze or the entire coal Stockpile for quality deviations results in waiver pursuant to Section 5.2. DVP waived its right to any remedy with regard to all Shipments during 2011 under the Pre-COD Confirmation after the termination by its own term of the Pre-COD Confirmation on December 31, 2012. [32] It is not entitled to any damages awarded by the lower Court in either opinion.

DVP never rejected the goods delivered pursuant to Master Agreement and the Pre-COD Confirmation (during the term of the Pre-COD Confirmation) and has admitted utilizing and continues to utilize the goods at VCHEC. (JA 2398,

---

[31]    Id., McCallum & Evans, 25 Energy & Mineral L. Inst. Ch. 8, p.231. (2005)
[32]    Id., McCallum & Evans, 25 Energy & Mineral L. Inst. Ch. 8, p.231. (2005) citing to UCC §2-604.

33

Trial Transcript p. 58) (JA 3950, Davis report, DVP's Trial Ex. 89); therefore, under Va. Code §8.2-606, DVP is has accepted the coal shipments if it fails to make an effective rejection after a reasonable opportunity to inspect (January 2011 through June 2014). By its own admission, DVP, had the Bransen analysis, did not reject any shipment or the entire stockpile, pursuant to the Master Agreement and Pre-COD Confirmation, even after learning about the coke breeze issue between in 2011 and 2012 and its admitted acts in keeping the coal stockpile and utilizing it are inconsistent with the seller's ownership and belie any claim for rejection damages. *Id.* § 8.2-606(b) and (c). In addition, having contracted with Mikon to conduct analysis on at least two occasions, JA 4978, DVP Trial Ex. 28, Jan 13, 2102; and JA 4981, cover letter for Mikon Report of June 19, 2013 no rejection followed. DVP took title, paid for the Coal delivered and exercised its ownership by utilizing the Coal to use in its operations. This is acceptance under the UCC[33] and utilizing the coal in its operations, under UCC 8.2-606(b) and (c), DVP, as a matter of law is not entitled to damages under the Master Agreement and Pre-COD Confirmation.

---

[33]     *United States ex rel. Whitaker's, Inc. v. C.B.C. Enterprises, Inc.*, 820 F. Supp. 242 (E.D. Va. 1993) ("By taking possession of the cabinets, cutting them to fit over pipes and installing the units, [defendant] accepted the cabinets within the meaning of the UCC."). *Accord* Va. Code §8.2-606 Official Comment 4 ("Under paragraph (c), any action taken by the buyer, which is inconsistent with his claim that he has rejected the goods, constitutes an acceptance.").

C.    No Direct Damages As Cover Resulted In Savings.

Should the Court conclude, under UCC's perfect tender rule and dispensation of all contractual rejection rights as well as the testimony of both Roarty and Workman that there was no rejection, that DVP rejected the entire coal stockpile for variances of Specifications as determined years after actual delivery and without timely notice (i.e. more than two years), then DVP is limited in its recovery under both contract (Master Agreement) (unless of course the Court will dispense with application of agreed to terms limiting damages, under that agreement) and Va. Code §8.2-712 to "cover."  "Cover" is Buyer's "reasonable purchase of coal in substitution for coal due from Seller."[34] DVP, expert, Guy A. Davis, testified that cover was effectuated for the alleged non-conforming Bransen Run-of-Mine Coal in the amount of 282,963 tons to complete the commissioning process at VCHEC with a savings of $106,358 to DVP.[35] That calculation includes certain blending costs that are actually incidental and consequential damages of $289,039.    As both incidental and consequential damages are waived under the Master Agreement, the correct cover savings is $289,039 plus the $106,358 for a total savings to DVP, based upon cover damages (savings) arising from a finding

---

[34]    Id., McCallum & Evans, 25 Energy & Mineral L. Inst. Ch. 8, p.231. (2005) citing to UCC §2-712

[35]    "Buyer may cover and recover from seller difference … together with any incidental and consequential damages but less expenses save in consequences of the seller's breach" Va. Code. §8.2-712. However, pursuant to the Master Agreement, Buyer may not recover either incidental or consequential damages.

that DVP timely either rejected or repudiated timely the entire coal stockpile, in the amount of **$395,397.00**. Subtracting the $14,000 in minor permit revisions to allow VCHEC to use minimal amounts of coke breeze, the net amount to Bransen resulting from cover savings is $381,397.00 due Bransen, not $22 million due DVP. And Bransen should be permitted, based upon the notion that DVP rejected the 600,000 tons to return and retrieve it from the Coal Stockpile all of which is consistent with Bransen's (Seller) ownership of the Coal Stockpile after either rejection or revocation by DVP under Va. Code §8.2.602 and §8.2.608. That, of course is impossible because most of the coal is gone.

### V. DVP DEMAND LETTERS ARE BAD FAITH IMPOSSIBLE TO PERFORM AND SUCH DEMAND CONSTITUTES CONSPIRACY TO VIOLATE MSHA STATUTES.

The impossibility doctrine of and defense to performance under contracts is well established under Virginia's contract law. *Housing Auth. of Bristol v. East Tennessee Light & Power Co.,* 183 Va. 64, 72, 31 S.E.2d 273, 276 (1944).

From June of 2013[36] forward to June of 2014 there was no effort by DVP to resolve the ongoing disputes despite the Courts factual finding otherwise. After Bransen's Demand Letter on June 12, 2014, DVP issued its demand letter on June 21, 2014 wherein Bransen was placed upon a three day cure for the Pre-COD Confirmation demanding that Bransen "cure" its alleged defaults within those three

---

[36]    Following DVP's cease and desist letter that Bransen not ever reenter the Coal Stockpile at the Lambert site.

days by returning to the Coal Stockpile – at the same time, refusing to allow Bransen access to the stockpile – and replacing the entire 600,000 tons within three days. JA 1653. This was an obvious physically impossible demand and further indicia of bad faith. DVP followed this with the original complaint filed in late July of 2014. Bransen then received a new demand notice by DVP regarding the CSA and the requirement to cure within (initially three days followed by thirty days or face termination). JA 1660. Another legal and physical impossibility and further indicia of bad faith as CTI, at DVP's insistence was replaced with controller/operator Omega/Harold Keene on site on MSHA Mine ID 44403443 June 1, 2013. [37] The contracting party demanding performance that is impossible (legally and physically) because the contracting party has rendered that performance impossible is prohibited then the promisor is excused from performance. *Restatement (Second) of Contracts* §§261 & 264 (1981).

Entering upon a mine and operating it without proper identification of and approval as a new operator and controller and establishment of a new Mine ID number subjects the entity and owners [38] to both civil and criminal penalties including conspiracy to commit illegal acts under MSHA. In particular, knowingly

---

[37]   See Mine Data Retrieval System Operator History for Mine ID 4403443 at arlweb.msha.gov/and enter MSHA Mine ID: 4403443. See also Omega/DVP Coal Service Agreement (redacted) JA 1854.

[38]   Replacing Omega and applying for operator status would take several months before approval, all of which DVP knew as it went through the process in removing CTI and hiring Omega Holdings in April-June of 2013.

entering and operating a mine site without MSHA approval, which by definition includes coal stockpiles, subjects the operator and its officers, directors and controllers to not only be assessed civil penalties but criminal sanctions including prison.[39] If a corporate director officer or agent knowingly authorized such safety violations, he or she would be potentially subject to the very same criminal penalties..[40] Greg Workman, on behalf of DVP, signed the operative Notices of Default in which he knowingly demanded that Bransen, without legal authority from MSHA, return to the Coal Stockpile and commence violations of relevant MSHA safety standards in three days. Because DVP had entered into a Coal Services Agreement with Omega Holdings in June of 2013 JA 1854, and DVP as the lessee of the Lambert site had to approve both Omega Holdings as controller and Harold Keene as operator, DVP and Greg Workman knew that demanding Bransen reenter the Coal Stockpile pursuant to either demand letter and without lifting the cease and decease letter, constituted an illegal and physically impossible task. Mr. Workman, pursuant to 30 USC §820(c) subjected both DVP as well as him personally to potential criminal sanctions.[41] Had Bransen attempted to do so it would have violated DVP's contractors agreement with Omega, violated the CSA

---

[39]     Any operator who willfully violates a mandatory health or safety standard may, on a first offense, be subject to prosecution in federal court and liable for a fine of up to $25,000 and one year in prison.  30 USC 820(d).

[40]     30 USC §820(c).

[41]     See *Richardson v. Secretary of Labor,* 689 F.2d 632 (6th Cir. 1982).

requiring compliance with laws, rules and regulations and resulting in Bransen committing illegal activity in that it was not the operator and seasonably could not become the operator.[42]    DVP, as the lessee of that Coal Stockpile, the other contracting party to the Omega Holdings Services Agreement, would be considered either a deemed controller or an "agent." Potential criminal sanctions would be no different than in the matter of Donald Blankenship.[43]  Had Bransen complied with DVP's demands and with a fatality, there is no doubt a criminal investigation would have ensued and potential conspiracy to commit violations of MSHA statutes issued.  Which raises a very interesting point.

The Fourth Circuit, simultaneously, must consider both the criminal conviction of former Massey CEO Donald Blankenship regarding criminal conspiracy to commit violations of MSHA safety standards[44] and this lower Court's ruling making light of MSHA requirements.  Essentially, the Fourth Circuit must either agree with this lower Court's ruling that attention to and diligence in refusing to violate MSHA safety rules including becoming an operator

---

[42]    See generally, 30 U.S.C. §801 et seq. as amended (the "Mine Act"). Specific reference to 30 U.S.C.§802(d) regarding definition of "operator" defined in Section 3(d) as "any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine[.]" Id.  *See also Bituminous Coal Operators' Ass'n v. Secretary of the Interior,*547 F.2d 240, 245 (4th Cir. 1977).  It should be noted it took Omega/Harold Keene several months to into compliance with MSHA upon entering the Coal Stockpile.

[43]    US. v. Blankenship, 16-4193

[44]    US. v. Blankenship, 16-4193

without MSHA approval (Bransen) was just a commotion not worthy of weighted discussion and as a result find that Massey CEO Don Blankenship's convictions should be overturned because his actions were merely a "kerfuffle." Or, in the alternative, take both Mr. Blankenship's conviction very seriously as well as Bransen's refusal to act in complicity to DVP's demands in violations of MSHA safety to satisfy DVP's Greg Workman. **To be blunt and very serious on this matter, miner's safety should always trump and this Court should applaud Bransen's refusal as opposed to the lower Court's summary dismissal of that refusal as silly.**

This is the essence of bad faith in contract dealings when a contracting party demands the other party act illegally or that such demand for performance is impossible or impracticable and rendered so by the acts of the demanding party. This should result in the CSA being void and unenforceable by DVP. *Hampton Roads Bankshares, Inc., et al v. Scott C. Harvard,* 781 S.E, 2d 172, 179. In *Harvard,* he sought performance of paying a golden parachute that was prohibited by EESA §111. '[T]he promisor cannot in good faith perform its contractual obligations without violating the law, the promisor is discharged from its obligation." Id. citing to *Harriscom Svenska v. Harris Corp.,* 3 F.3d 576 (2d Cir. 1993) and *Restatement (Second) of Contracts* §264 cmt. b. Such demands constitute a breach of the related agreements and results in a void contract.

Because of the impossibility of performance without violating a federal statute (as here) the Supreme Court of Virginia ruled that the agreement was "void and unenforceable." *Harvard,* p. 180.

Regarding the obligation under the Pre-COD Confirmation, other than Bransen's obligations to deliver Coal meeting specifications to which the exclusive remedies are rejection and suspension[45] there was no obligation to return to the Lambert site and remove the 600,000 tons of coal previously delivered. That too was impossibility as DVP had commenced utilization of that coal such that at the end of July of 2014, more than 45,000 tons had been shipped by DVP. Thus, DVP rendered impracticable both from a timing standpoint (three days) and from a utilization standpoint, the demand it made upon Bransen. Those demands were therefore null and void, of no effect and the lower Court's ruling otherwise was legally unsupported.

## VI.    NO DAMAGES PROVEN UNDER THE COAL SERVICES AGREEMENT.

Despite the allegations that Bransen defaulted under the Coal Services Agreement and the lower Court's rulings that the rejection of ready-piles were the

---

[45]    In reference to DVP's First Amended Complaint, compare the Notice of Default of the Master Agreement and Confirmations wherein event of default under the Services Agreement declared regarding 'unsuitable moisture and sizing' as constituting such that it went to the essential purpose of the parties agreement and paragraph 40, 41 of the First Amended Complaint. Judge Spencer's opinion does not address this anomaly before rulings relating to valid notices of default.

operative breach of contract resulting in in excess of $22 million in damages assessed to Bransen, DVP, through its expert, Guy Davis, could point to no damages arising from Bransen's alleged defaults under the Coal Services Agreement. It testimony at the damages hearing was that all damages arose from a breach of the "coal supply agreements." It is well established contract law that without damages there can be no breach of contract.

DVP'S expert Guy Davis opined that there was only a default under the coal supply agreements (i.e. the Pre-COD Confirmation) and that all of his estimation of "direct" damages set forth in his report (Plaintiff's Ex. 89) arise from default of quality of the coal delivered and accepted by DVP under the coal supply agreements. There were no damages arising from any claimed defaults of the Coal Services Agreement. No breach if no damages. *See Sunrise, supra.* As a matter of law, without damages there is no breach of the Coal Services Agreement.

It was impossible for Bransen to enter upon the Coal Stockpile in June of 2013; (i) pursuant to the cease and desist letter; (ii) DVP Services Agreement with Omega Holdings; (iii) Omega Holdings controller under MSHA ID. No. 4403443 and (iv) would have violated the provision of Services Agreement on compliance with laws. From a legal, regulatory and DVP standpoint that was a legal

impossibility.[47] DVP did not prove that Omega would have abandoned its contract, ceased work under its Contract with DVP and allowed Bransen to enter and work under its MSHA ID permit. DVP offered no answer as to why it did not lift the cease and desist letter in conjunction with its demand. As a matter of law, Bransen is discharged from further performance under the Coal Services Agreement because it was legally impossible for Bransen to do so.

## VII.   DVP FIRST TO MATERIALLY BREACH MASTER AGREEMENT, THE TWOPOST-COD CONFIRMATIONS AND THE COAL SERVICES AGREEMENT.

The lower Court refused to consider Bransen's Motion for Partial Summary Judgment on the issue of DVP's material breach of Master Agreement and the two Post-COD Confirmations because it ruled that the seven percent installment delivery of coke breeze was Bransen's first to breach.  However, in fact, and testified to by more than one DVP official, DVP made the decision in early to mid 2011 to "do no business with Bransen."  JA 333, Roarty dep., thus declaring that it was breaching the $80-90 million obligations to purchase 3 million tons of coal from Bransen through 2017 pursuant to the two Post-COD Confirmations.

---

[47]    Under section 457 of the *Restatement of Contracts* (1932), "after the formation of a contract facts that a promisor had no reason to anticipate, and for the occurrence of which he is not in contributing fault, render performance of the promise impossible, the duty of the promisor is discharged…." Id.

The uncontroverted evidence is that as of March 25, 2013, DVP counsel made clear to then counsel for Bransen, Jeffrey Skinner, that Bransen was not in default of any of its agreements including the Coal Services Agreement, the Master Agreement and the three Confirmations and that each was still in effect. As Skinner testified to in his affidavit that Mr. Boland and Mr. Frei stated to Skinner that the contracts between Dominion and Bransen were not terminated and that Bransen should be ready to perform because they were not terminated. JA 2179. Neither Boland nor Frei refuted these statements during summary judgment pleadings. Following the email string attached to Skinner's affidavit it becomes clear that time Bransen counsel tried to tie down that the agreements with DVP had terminated, DVP counsel responds that such statements "are inaccurate" thus acknowledging that the Coal Services Agreement was not in default nor terminated. JA 2179. Again, in a long email written to Ryan Frei from Andrew Sachs (Skinner's partner) in response to Frei's March 13, 2013 email, Bransen counsel again sought confirmation that either the Coal Services Agreement was terminated or that it was not and removing coal without Bransen's involvement "would clearly breach that agreement." The final emails confirm that the conversation referenced in Skinner's email was scheduled for March 26, 2013. Thus, as late as March 26, 2013, a full year after the Bransen's alleged "material breach" by compiling a ready-pile, DVP maintained no material breach had

occurred and that it made clear, through counsel, that all agreements were fully in place. This was wholly inconsistent with the "no further business" declarations in early to mid 2012. Why would DVP be so adamant that Bransen was not in breach of any agreement, and that no agreement between Bransen and DVP had been declared terminated? That motivation to make abundantly clear that DVP did not consider any of the agreements in breach or terminated was the provision in the CTI lease that should DVP terminate any of its agreements with Bransen, then CTI had no obligation to renew its lease and could retain the entire coal stockpile DVP had purchased from Bransen. While DVP had announced initially to Bransen that there was to be no further business and thus an anticipatory repudiation of DVP's obligations to purchase three million tons from Bransen at a gross value of between $80 to $90 million dollars, DVP attempted to parlay its position that there was breach to CTI in order to secure an extension of the lease and to remove the default provision.

So, from a timing standpoint, DVP maintained Bransen was in full compliance with each of the agreements (with the Pre-COD Confirmation having terminated on its term on December 31, 2012) and should stand ready to commence shipments under the two Post-COD Confirmations and resume its contracting work pursuant to the Coal Services Agreement. DVP, having learned that the principals (Daniel Bunn and Brian Findley) were at odds, it sought to

45

capitalize on these disagreement by negotiating only with Mr. Bunn during April and May of 2013. DVP assumed it could replace Bransen/CTI with Omega and CTI would acquiesce in allowing Omega to arrive on site and work under CTI's MHSA permit. CTI refused to subject itself to the enormity of potential liability both civil and criminal by allowing an undisclosed operator, without MSHA permission, to enter to operate the Coal Stockpile. As a result, Harold Keene became the MSHA operator on June 1, 2013 and commenced, pursuant to the DVP/Omega Agreement to perform the services and be paid for those services in lieu of Bransen who still had the right to perform those services and be paid. When Bransen attempted to return to the Coal Stockpile, upon learning of the insertion of Omega/Harold Keene in place of Bransen/CTI, Bransen's trucks were repelled. Immediately DVP issued a cease and desist letter to Bransen demanding that Bransen not be permitted to enter upon the Coal Stockpile and not be permitted to perform further services. Again, another uncontroverted and demonstrative example of DVP being the first to materially breach.

## VIII. DAMAGES AWARDED AT DAMAGES HEARING NOT PROVIDED FOR IN AGREEMENTS.

The lower Court, after a two-day hearing on DVP's damages arising from the Opinion and Order One ruling that Bransen had materially breached the Master Agreement, the Pre-COD Confirmation and the CSA, the lower Court awarded in excess of $22 million dollars in damages none of which is supported by the

language in the applicable agreements or Virginia's version of the Uniform Commercial Code.  After lengthy testimony by DVP's damages expert witness, Guy Davies, the consequential and incidental damages and future speculative damages arising from the breach of the "coal supply agreement" are as follows:

| | | |
|---|---|---|
| 1. | Lost profits  i.e. market depreciation | 9,959,447. |
| 2. | consequential damages i.e. coal services | 8,003,966 |
| 3. | incidental damages i.e. land rental | 463,000 |
| 4. | missing coal (See Argument I above) | 1,830,613 |
| 5. | Coke breeze (section 5 of Master Agreement) | 1,943,629 |
| 7. | Cover--Replacement coal savings (less consequential damages of blending) | (395,397) |
| 8. | Permit fees | 14,000 |

A.  Lost Profits Not Permitted Under Contract.

A fairly easy review of the damages permitted under the Master Agreement found in the all in capital letters Section 8.8 on Limitation of Liability. Absent a remedy provided for (such as Section 5) the "PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY…NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXMEPLARY OR INDIRECT DAMAGES, LOST

PROFITS, OR OTHER BUSINES INTERRUPTIN DAMAGES…WITHOUT REGARD TO CAUSE...

In what appears as a listing of these prohibited remedies, DVP's damages included every remedy disclaimed.

1.  Lost profits/indirect damages.

Essentially, DVP convinced the lower Court that it is entitled to lost profits of $9,959,447 in the form of depreciation in value of the Coal Stockpile. DVP provided no probative evidence that it be remitted almost Ten million dollars for goods it purchased and is utilizing on a daily basis. It did not resale any of the 600,000 tons. As of the end of the first quarter of 2016 almost sixty percent or 357,000 tons of the coal has been removed from the Coal Stockpile and utilized by DVP. DVP is not entitled to a diminution in value because the coal market crashed and then use it as a hammer against Bransen. DVP lost profit/indirect damages waived and are therefore not recoverable .JA 49, Master Agreement. In addition, as the Pre-COD confirmation terminated on its own term on December 31, 2012, DVP is precluded some two years later from asserting cancellation damages.[48]

---

[48] Compare Va. Code §8.2-106(3) definition of "termination versus Va. Code §8.2-1-6(4) "cancellation. See Park, Sweeney VanKirk and Americus; Coal Supply Contracts, §84.02; Coal Law and Regulation, Matthew Bender (1984) for discussion of limitations on recovery under terminated coal supply agreement.

2.     Consequential damages.

DVP was awarded Eight million dollars as a consequence of refusing to allow Bransen to perform its contracted for services under the CSA and instead paying Omega substantially more per ton for the same coal services it had contracted with Bransen. Those increases in costs of services are a consequence of DVP refusing to allow Bransen to fulfill its obligations under the CSA after April of 2012 and declaring that it was no longer doing business with Bransen. The exact type of damages in consequence of DVP's decisions that DVP disclaimed. As consequential damages were disclaimed and it was DVP's first material breach of the CSA that resulted in the consequence of a much more expensive contractor than Bransen, DVP is certainly not entitled to that Eight Million in increased coal service fees paid to Omega. JA 40, Master Agreement.[49]

3.     Incidental Damages/Lease increase costs.

DVP also has prevailed that Bransen continue to pay DVP's lease costs for the CTI site. This is an incidental damage arising from DVP's decision to not allow Bransen to perform under the CSA and incidental to hiring a more expensive contractor. DVP waived claims for these type damages. JA 40, Master Agreement.

---

[49] *Blue Stone Land Company, Inc., v. Neff,* 526 S.E. 2d 517, 519 (Va. 2000) "Direct damages arise 'naturally' or 'ordinarily' from a breach of contract…expected to result from a breach. Consequential damages are those which arise from the intervention of 'special circumstances' not ordinarily predictable" i.e. electing to process the coal. Id.

4.    Missing coal.

DVP has prevailed on a claim it stated in open court it had abandoned followed by the grant of a motion for directed verdict disallowing the $1,830,613. Not to be deterred by abandonment followed by directed verdict the lower Court proceeded to grant DVP damages of $1,830,613 for coal that was in fact not missing.

5.    Coke Breeze.

Because the coke breeze judgment arose from the lower Court's finding that Bransen had breached the CSA by having rejected 4500 tons of ready piles that DVP already owned, it would be assumed that these damages arose from the material breach of the CSA.  However, the only direct testimony, from DVP expert Guy Davis, is that no damages resulted from a breach of the CSA. The Court must reconcile these incongruous positions.  Absent proving that the coke breeze was returned to Bransen (or 43,000 tons of coal containing coke breeze) and absent the ability to link or have cross default provisions, Opinion and Order One and the direct and only testimony from the damages hearing are unresolved.  When facts present from the moving party after a summary judgment motion demonstrating material disagreement with their own claim of undisputed facts driving the summary judgment the obvious legal conclusion that the summary judgment should not have been granted.

6.    Balance of permit fees and cover savings.

In an admission against interest, DVP obtained millions of dollars in damages for having to "blend" and wash product delivered by Bransen while at the same time offsetting the almost $400,000 in cover savings with the expense of blending and washing the cover coal it purchased from other sources to run the Pre-COD testing of the VCHEC. Bransen should not have to pay for the inability of DVP to purchase coal product sufficient to test VCHEC without further treatment. Thus, it is proposed that the gross amount of cover damages be reduced by the $14,000 in permit fees. The only damages Bransen will admit were direct in supplying coke breeze. It should be demonstrated that this also demonstrates the only real but diminutive nature of the delivery of coke breeze which DVP continues to use in producing to VCHEC from the Coal Stockpile ($14,000/$26,724,725= 0.0005238 and therefore a .00053 percent damage. Again, hardly a material breach!

## CONCLUSION

Upon review this Court should reverse the lower Court as to its summary judgment finding that Bransen materially breach the Master Agreement and Pre-COD Agreement by delivering certain installments not meeting all specifications of the contracts. This was not a material breach, DVP continues to utilized the

51

goods delivered and suffered no damages.  The Court should remand for a hearing

damages arising from DVP's material breach of all the agreements.

## REQUEST FOR ORAL ARGUMENT

Appellant Bransen Energy, Inc., does not request oral argument.  The

resolution of these contract law issues can clearly be discerned by reference to the

applicable contracts, statutes, legal authorities and case law and should not require

the additional time and expense of oral argument.

Respectfully submitted

**BRANSEN ENERGY, INC.**

/S/ Sam P. Burchett
SAM P. BURCHETT, ESQ.
Kentucky Bar No. 81339
Admitted *pro hac vice*
*Attorney for Bransen Energy, Inc.*
200 W. Vine Street, Suite 720
Lexington, Kentucky  40507
Telephone 859- 226-2100
Fax: 859-222105
spburchett@gmail.com

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that the foregoing OPENING BRIEF OF APPELLANT complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as it contains <u>10,400 words</u>, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as it has been prepared in <u>Microsoft Word 2010, Times New Roman, 14 point font</u>.


<u>s/ Sam P. Burchett</u>

DATED: May 6, 2016          Sam P. Burchett, ESQ.

*Counsel for Appellant*

53

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing to the following counsel of record:

> J. William Boland
> E. Duncan Getchell, Jr.
> Ryan D. Frei
> Katherine Mims Crocker
> *Counsel for plaintiff*
> MCGUIRE WOODS LLP
> Gateway Plaza
> 800 East Cary Street
> Richmond, Virginia  23219-4030

> /s/ Sam P. Burchett
> SAM P. BURCHETT, ESQ.
> Kentucky Bar No. 81339
> *Attorney for Bransen Energy,   Inc.*
> 200 W. Vine Street, Suite 720
> Lexington, Kentucky  40507
> Telephone 859- 226-2100
> Fax: 859-222105
> spburchett@gmail.com